USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/9/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE BLOCK, INC. SECURITIES LITIGATION

22-CV-08636 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiffs brought two putative class actions against Block, Inc. ("Block") and three individual officers and directors under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and under Sections 12(a)(2) and 15 of the Securities Act of 1933. Their claims concern allegedly false or misleading statements and omissions made by Block regarding its data security both before and after an alleged December 10, 2021, data breach by a former Block employee that resulted in the theft of certain personally identifiable information ("PII") of millions of Block customers. Defendants have moved to dismiss the operative Consolidated Amended Complaint. Because the Court finds that Plaintiffs have failed to allege material misstatements or omissions, and that Plaintiffs have failed to allege scienter with respect to their fraud claims, the motion to dismiss is **GRANTED**.

## BACKGROUND

Defendant Block (previously known as Square, Inc. ("Square")) is a global technology company that provides e-commerce and payment services to small businesses. Consolidated Amended Complaint, Dkt. No. 87 ("Complaint" or "CAC") ¶¶ 2, 13. As part of its business, it collects PII from its customers in connection with its "Cash App" product, which is used to transfer money, facilitate direct deposit payments, purchase investments, and more. *Id.* ¶¶ 13–

14.  Block's Class A common stock trades on the New York Stock Exchange under the symbol "SQ," and on the Australian Stock Exchange in the form of CHESS Depository Interests ("CDIs") under the symbol "ASX," "with each CDI representing a beneficial interest in one share of [Block's] Class A common stock."  *Id.* ¶ 9.

Defendant Jack Dorsey is Block's co-founder and served as its Chief Executive Officer and President from July 2009 until April 2022; he is now "Block Head" and Chairman of the Board of Directors.  *Id.* ¶ 10.  According to the Complaint, as of March 31, 2022, Block reported that Dorsey owned 48,844,566 Class B Block common shares, more than 43% of Block's voting power.  *Id.*  Defendant Amrita Ahuja was at all times relevant to this action the Chief Financial Officer for Block.  *Id.* ¶ 11.  Defendant Jim McKelvey (collectively with Dorsey and Ahuja, the "Individual Defendants") is Block's co-founder and a member of its Board, and he owns more than 12 million shares of Block's common stock.  *Id.* ¶ 12.

Plaintiffs are suing in connection with allegedly false or misleading statements and omissions made by Defendants before and after a data security incident at Block on December 10, 2021, involving the theft of customer PII from the Cash App investment brokerage business. Plaintiffs are separated into two classes:  (1) Those who purchased shares of Block securities between February 26, 2020, and April 4, 2022 (the "Class Period") are bringing fraud claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and the U.S. Securities and Exchange Commission's ("SEC") implementing rule, Rule 10b-5, 17 C.F.R. § 240.10b-5(b); and (2) Those who owned securities in a different company, Afterpay Limited ("Afterpay"), and who, in a subsequent merger of Block and Afterpay, exchanged their Afterpay securities for unregistered Block Class A common stock or corresponding CDIs, are bringing claims under Section 12(a)(2) of the Securities Act of 1933

("Securities Act"), 15 U.S.C. § 77l(a)(2), which Plaintiffs assert "[do] not involve or require any allegations of either fraud or reliance."  Plaintiffs are also bringing control person claims against all Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and against Dorsey and McKelvey under Section 15(a) of the Securities Act, 15 U.S.C. § 77o. Specifically, Lead Plaintiff Fotios Sotiropoulos purchased Block securities during the Class Period and is bringing class action claims under Sections 10(b) and 20(a) of the Exchange Act. CAC ¶ 6. Plaintiff Kevin Sawyer held 1,440 ordinary shares of Afterpay before the merger, which were converted to 540 Block CDIs, and is also bringing class action claims under Sections 10(b) and 20(a) of the Exchange Act.[1]  *Id.* ¶ 8 Lead Plaintiff Official Intelligence Pty. Ltd. ("OIP") held 16,376 ordinary shares of Afterpay before the merger with Block, and those shares were converted to 6,141 Block CDIs in connection with the merger.  *Id.* ¶ 7.   OIP is bringing class action claims under Sections 12(a) and 15(a) of the Securities Act.

### I.    Procedural History

Donna Esposito, who was then a plaintiff, commenced this action against Defendants Block, Dorsey, and Ahuja by filing a complaint on October 11, 2022 (the "*Esposito* action") under Sections 10(b) and 20(a) of the Exchange Act.  *See* Dkt. No. 1.  On January 4, 2023, Judge Ronnie Abrams, who was then presiding over the case, entered an order appointing Plaintiff Sotiropoulos as the lead plaintiff of the *Esposito* action, on behalf of a class that had acquired Block securities between November 4, 2021, and April 4, 2022; she also appointed lead counsel. *See* Dkt. No. 45.  On January 31, 2023, plaintiff Jordan Michael Hart filed a putative class action against Block, Dorsey, Ahuja, and Afterpay executive Anthony Eisen under the Exchange Act

---

[1] It is unclear why Plaintiffs bring Sawyer's claims under Sections 10(b) and 20(a) of the Exchange Act rather than Sections 12(a) and 15(a) of the Securities Act because Sawyer, like OIP, received Block CDIs after the merger with Afterpay.  This is of no moment, however, as all claims suffer from the same fatal defect, as explained herein.

and Rule 10b-5; the action also included Securities Act claims on behalf of former shareholders of Afterpay who acquired Block securities.  Dkt. No. 1, *Hart v. Block, Inc.*, No. 23-cv-1579.  On March 7, 2023, Judge Abrams consolidated the case with this action, and incorporated her prior order appointing Sotiropoulos as lead plaintiff.  *See* Dkt. No. 53.

Subsequently, on April 3, 2023, OIP filed an additional putative class action against Block, Dorsey, and McKelvey under Sections 12(a) and 15 of the Securities Act, and it moved for appointment as lead plaintiff and for approval of its proposed lead counsel.  *See* Dkt. Nos. 54–55; *see also Official Intelligence Pty Ltd. v. Block, Inc.*, No. 23-cv-02789.  On February 15, 2024, Judge Abrams issued an opinion and order consolidating OIP's action with the *Hart* and *Esposito* actions, maintaining Sotiropoulos as lead plaintiff for the Exchange Act claims only, appointing OIP as lead plaintiff for the Securities Act claims, and approving OIP's selected law firm as lead counsel for those claims.  *See* Dkt. No. 80.

The case was reassigned to the undersigned on February 26, 2024.  On April 15, 2024, the parties filed the operative Complaint.  *See* CAC.[2]  Pending before the Court now is Defendants' motion to dismiss the Complaint in its entirety.  *See* Dkt. No. 93 ("Defs.' Br.").[3]

## II.    Relevant Facts

Plaintiffs allege that "[t]he market for PII is not a legal one but a thriving 'black market,'" and because Block collects PII of its customers who use its Cash App product, "[t]he damage that can be caused by disclosure of PII makes potential Block customers sensitive about providing their PII."  CAC ¶ 14–16.  Plaintiffs further allege that in its public privacy notice to

---

[2] The CAC included a certification by Plaintiff Sawyer stating that he was willing to serve as a representative party on behalf of the class.  *See* Dkt. No. 87-1.

[3] Since the motion was fully briefed, the parties have filed several letters notifying the Court of new authorities.  *See* Dkt. Nos. 96–100.

customers and in its public filings with the SEC, Block has "acknowledged the substantial risks that data loss or security breaches would pose to [Block]," including damage to its business and reputation and potential financial losses and liability. *Id.* ¶¶ 17, 19–25.

On December 10, 2021, Block experienced what Plaintiffs describe as a data breach[4] when a former employee of Block "accessed the Company's networks and downloaded certain reports of Cash App that the [former employee] accessed as part of their past employment responsibilities" (the "Incident"). *Id.* ¶¶ 2, 31. The former employee downloaded certain items of PII for approximately 8.2 million Cash App users. *Id.* ¶ 31. Block publicly announced the Incident on April 4, 2022, in connection with filing its Form 8-K with the SEC.[5] *Id.* ¶ 33. Plaintiffs allege that after this disclosure, the price of Block's common stock "plummeted," as did the price of Block's CDIs, which trade on the Australian Stock Exchange. *Id.* ¶ 34.

Plaintiffs allege that Defendants made various material misstatements and omissions to Block shareholders and to Afterpay shareholders that, generally speaking, fall into two categories: Statements that allegedly misrepresented the state of data security at Block and statements that allegedly concealed the Incident.

### A. Alleged Misstatements to Block Shareholders

In connection with the fraud allegations, Plaintiffs Sotiropoulos and Sawyer allege that Block made various material misstatements and omissions to shareholders who purchased Block securities during the Class Period.

---

[4] Defendants argue that while Plaintiffs characterize the incident as a "data breach," it did not involve a "breach" of Block's systems, because rather than access by a hacker, the data was stolen by a former employee who was once authorized to access it. Defs.' Br. at 4–5. Neither party disputes the basic facts about the Incident and the difference in descriptive names, while hotly disputed by the parties, is not relevant to resolving any issue presently before the Court.

[5] The CAC refers in passing to a second, later, data breach incident, *see* CAC ¶ 38, but Plaintiffs do not bring any claims as a result of this incident.

With respect to statements made prior to the Incident that allegedly misrepresented the state of data security at Block, Plaintiffs allege that Block did not, in fact, meet accepted industry cybersecurity standards, which "seek[] to prevent former employees from gaining access to the PII maintained by companies on their data system." *Id.* ¶ 26. The Complaint relies on the opinion of Monty Myers,[6] "who possesses an education, background, experience, training, and expertise, including information technology/security," and who opines that "'Block, Inc. and its subsidiary Cash App Investing LLC [] did not have adequate information security protections in place at least around the date of the December 10, 2021 data security breach [] as it relates to former employee and system access controls.'" *Id.* ¶ 30. Plaintiffs allege that "[i]f minimally effective security programs had been in place, then the [former employee] would not have been able to use their credentials to access Block's network and download *any* information." *Id.* ¶ 32. Plaintiffs did not, however, allege anything about *how* the former employee gained access to the PII (for example, by leaving open a "backdoor" before departure, or using stolen credentials, or exploiting a mistake or negligence that left the former credentials still usable, or some other method), and they state that Block has not publicly disclosed how the former employee came to access the information. *Id.* ¶ 35. They allege that "[s]ome experts believe that the breach came from an orphaned account still active on a third-party software as a service . . . application like a cloud storage solution or from a lack of proper communication protocols between Block's Human Resources and IT departments." *Id.* Overall, they allege that Block's statements about its data security prior to the Incident were materially misleading because they failed to reveal that Block in fact lacked adequate data security measures.

---

[6] Mr. Myers is named both as "Monty Myers," *see, e.g.*, CAC ¶ 30, and "Monty Meyers," *id.* ¶ 124.

Specifically, Plaintiffs allege that Block's Form 10-K filed with the SEC for the period ending on December 31, 2019 (which was filed on February 26, 2020) "emphasized the risk of a data breach and the potential material impact on Block's business, but it failed to disclose that Block lacked adequate security measures or protection procedures to prevent a serious data breach." *Id.* ¶ 98. Similarly, Plaintiffs allege that Block filed a Form 10-K with the SEC on February 23, 2021, a Form 10-Q with the SEC on August 2, 2021, and a Form 10-Q with the SEC on November 4, 2021; Plaintiffs allege that all of these forms similarly acknowledged the risk of data security breaches, but failed to disclose that Block lacked adequate data security measures or controls. *Id.* ¶¶ 100–103.

Plaintiffs also allege that Defendants made various statements following the Incident that did not reference the Incident. On January 12, 2022, Block announced on its website that it received an "ISO 27001 certification" for information security, which it claimed "validates the strength and effectiveness of Square's information security management system." *Id.* ¶ 104. However, the announcement did not mention the Incident. *Id.* ¶ 104–05. On January 31, 2022, Block issued a press release that "touted Defendants['] excitement over the Afterpay merger . . . [but] there was no mention of the massive Data Breach." *Id.* ¶ 106. Also on January 31, 2022, Block filed a Form 8-K with the SEC "stating, among other things, that Block completed its merger with Afterpay, but omitted the massive Data Breach." *Id.* ¶ 107. Similarly, on February 24, 2022, Block published its annual shareholder letter that was filed with its Form 8-K, which "detailed highlights from the fourth quarter of 2021, and its successful efforts in acquiring new Cash App customers and driving their engagement," but omitted mention of the Incident. *Id.* ¶ 108. Finally, Plaintiffs allege that also on February 24, 2022, Block filed with the SEC a Form 10-K that "expressly emphasized the risk of a data breach, and the material impact on [Block]

that would be posed by such a breach[,]" but was "false and misleading as [it] failed to disclose the massive Data Breach." *Id.* ¶¶ 109–13.

Overall, Plaintiffs allege these statements were materially false or misleading because they failed to disclose "(1) that [Block] lacked adequate security measure[s], controls, or protocols . . .; (2) that, as a result, a former employee was able to steal customer PII . . .; (3) that, as a result, [Block] was reasonably likely to suffer significant damage . . .; (4) and that, as a result of the foregoing, [Block]'s positive statements [about its] business, operations, and prospects, and the merger with Afterpay, were materially misleading." *Id.* ¶ 114.

### B.  Alleged Misstatements to Former Afterpay Shareholders

In connection with the claim brought under Section 12(a) of the Securities Act, Plaintiff OIP alleges that Defendants made material misstatements to former Afterpay shareholders (who would acquire Block securities) to facilitate the merger of Block and Afterpay.

It alleges that "[i]n August 2021, Block executives believed that they could obtain corporate synergies by merging Block and Afterpay." *Id.* ¶ 40.  On or about August 2, 2021, Block and Afterpay entered into a Scheme Implementation Deed (the "Deed") to facilitate Block's acquisition of all Afterpay ordinary shares in exchange for Block securities; the Deed provided that Afterpay intended to propose the merger scheme and to issue a "Scheme Booklet," which would provide information from Block intended for Afterpay shareholders. *Id.* ¶¶ 41–43. Per Plaintiff, in the Deed, Block represented and warrantied that the Block information provided for incorporation in the Scheme Booklet, as of the date of the Scheme Booklet, "'will not contain any material statement which is misleading or deceptive nor contain any material omission having regard to applicable disclosure requirements.'" *Id.* ¶ 43 (citing Deed § 12.3(h)).  The Deed provided that Block must promptly provide Afterpay with new or further information after

the Scheme Booklet had been distributed and until the date of the shareholders' special meeting to ensure that booklet was not "'false, misleading, or deceptive in any material respect (including because of any material omission).'" *Id.* ¶ 44 (citing Deed § 5.3). The Scheme Booklet, in turn, "advised Afterpay's shareholders that Afterpay would update the Scheme Booklet if it became aware of, among other things, a material omission from the Scheme Booklet." *Id.* ¶ 45. Plaintiffs allege that Block "exercised control over the contents of the Scheme Booklet relating to a discussion of Block's business." *Id.* ¶ 50. "On November 4, 2021, the Supreme Court of New South Wales [in Australia] approved of Afterpay distributing the Scheme Booklet and convening a special meeting . . . to obtain Afterpay shareholder approval of the [merger]." *Id.* ¶ 49. The Scheme Booklet was distributed to Afterpay shareholders by mail and email on November 5, 2021. *Id.* ¶ 51. The Special Meeting was opened on or about December 6, 2021, and then adjourned to December 14, 2021. *Id.* ¶ 59. On December 7, 2021, the Australian court approved the distribution of supplementary materials to Afterpay shareholders, which were distributed the same day. *Id.* ¶¶ 60–62. During the Special Meeting on December 14, 2021, Afterpay shareholders voted to approve the merger. *Id.* ¶ 65. On December 17, 2021, Afterpay "issued an announcement . . . that it had lodged orders made by the Supreme Court of New South Wales with the [Australian Securities and Investments Commission ("ASIC")], and that as a result the scheme was legally effective." *Id.* ¶ 66. On January 31, 2022, Block's subsidiary, Lanai (AU) 2 Pty Ltd., which was created to facilitate the Afterpay transaction, *id.* ¶ 9, completed its acquisition of all Afterpay shares, and Block issued 113,387,895 new common stock, including common stock underlying 95,377,954 new Block CDIs. *Id.* ¶ 68.

   With respect to alleged misstatements, Plaintiff points to the Scheme Booklet's statement that Block published privacy policies and terms of service that state, "[w]e have implemented

technical and organizational measures designed to secure your personal information[.] . . . However, we cannot guarantee that unauthorized third parties will never be able to defeat those measures[.]" *Id.* ¶ 47.  Furthermore, the Scheme Booklet provided that Block's collection and use of information was "subject to the laws and regulations in the United States, the European Union, and elsewhere." *Id.* ¶ 46.  Plaintiffs allege that "Block failed to disclose that Block, in fact, had not properly implemented 'technical and organizational measures designed to secure [] personal information' and made no mention in the Scheme Booklet of the security flaws suffered[.]" *Id.* ¶ 48.

Similarly, Plaintiff points to Section 5 of the Scheme Booklet, which noted that Block's collection of information was subject to laws and regulations in the United States and elsewhere and provided information about the public availability of Block's SEC filings. *Id.* ¶ 53.  Plaintiff further points to Section 7 of the Scheme Booklet, which notes that Block's risk factors can be found in Block's Form 10-K filed on February 23, 2021, and Form 10-Q filed on August 2, 2021. *Id.* ¶ 54.  Plaintiff notes that the referenced 10-K includes risk factors such as potential harm from negative publicity, the risk of the unauthorized access to sensitive data, the risk of the failure to comply with privacy, data protection, or information security policies, and the harm to the products from errors such as security breaches. *Id.* ¶ 55.  Plaintiff alleges that Sections 5 and 7 and the information incorporated by reference into the Scheme Booklet by those sections, including the Form 10-K, "were materially misleading in suggesting that Block's data protection policies and procedures were effective while, at the same time, Block was failing to take basic security protections with respect to the PII of its customers." *Id.* ¶ 71.

## DISCUSSION

### I.    Legal Standard on a Motion to Dismiss

In order to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim only has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When ruling on a Rule 12(b)(6) motion, the district court must accept all factual allegations contained in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Koch v. Christie's Int'l, PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, courts are not required to accept as true legal conclusions; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678.

In assessing the sufficiency of the complaint, the Court may consider documents "incorporated into the complaint by reference or attached to the complaint as exhibits, or whose terms and effect are relied upon by the plaintiff in drafting the complaint." *See Gryl ex rel. Shire Pharm. Grp. PLC v. Shire Pharm. Grp. PLC*, 298 F.3d 136, 140 (2d Cir. 2002), *cert. denied*, 537 U.S. 1191 (2003). The Court may also consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which the plaintiff relied in bringing the suit." *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## II.     Overview of Claims and Applicable Law

Section 10(b) of the Exchange Act provides that it is unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules or regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, the SEC's implementing rule, makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). In order to state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (internal references omitted).

Because claims under Section 10(b) and Rule 10b-5 sound in fraud, Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b)(1), require a heightened pleading standard. Accordingly, "[a] securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)); *see also* 15 U.S.C. § 78u-4(b)(1)(B). Further, under the PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

12

"Section 12(a)(2) [of the Securities Act] imposes liability for selling or offering securities by using a prospectus 'which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission).'" *In re Qudian Inc. Sec. Litig.*, No. 17-cv-9741 (JMF), 2019 WL 4735376, at *5 (S.D.N.Y. Sept. 27, 2019) (quoting 15 U.S.C. § 77l(a)(2)).  A plaintiff bringing a claim under this provision typically need not plead scienter.  *See id.*  "Thus, to make out a prima facie case at the pleadings stage, Plaintiffs need only allege a material misstatement or omission."  *Id.* (internal references omitted).[7]

With respect to both claims, Defendants argue that Plaintiffs failed to adequately allege that Defendants made any material misstatements or omissions.  With respect to the fraud claim, Defendants further argue that Plaintiff failed adequately to allege scienter.[8]

---

[7] Defendants argue that the heightened pleading standard of Rule 9(b) applies to the Section 12(a)(2) claim.  Rule 9(b) applies to Section 12(a)(2) claims when the claims sound in fraud because the rule "applies to 'all averments of fraud.'"  *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (quoting FED. R. CIV. P. 9(b)).  This inquiry "requires a case-by-case analysis of particular pleadings to determine whether the gravamen of the complaint is plainly fraud."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (internal references omitted).  The Second Circuit recently held in a summary order that "[a] plaintiff may retain the application of the Rule 8 notice pleading standard by expressly pleading negligence, disclaiming fraud, eschewing language in its Section 11 or Section 12(a)(2) claims implying fraud or the elements thereof, and separating allegations supporting fraud claims from allegations supporting negligence claims."  *Pappas v. Qutoutiao Inc.*, No. 23-1233, 2024 WL 4588491, at *2 (2d Cir. Oct. 28, 2024) (summary order).  However, the Court need not determine this issue because dismissal of the Section 12(a)(2) claim is warranted even if the Rule 9(b) standard does not apply, for the reasons explained below.

[8] Defendants also argue that the CAC does not identify with particularity each statement alleged to be misleading and is thus improperly "puzzle pled."  The practice of puzzle-pleading is characterized by lengthy block quotes followed by *pro forma* reasons why the statements are allegedly false; courts have held that puzzle-pleading fails to state a claim because it is insufficiently particular under the PSLRA.  *See, e.g., Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 477–78 (S.D.N.Y. 2021).  Although the CAC is not a model of clarity, it sufficiently states with particularity the statements alleged to be misleading, the circumstances under which the statements were made, and why the statements are allegedly false or misleading.  In any event, as explained herein, the Complaint should be dismissed for reasons not requiring a finding of "puzzle pleading."

### III.    The Statements Alleged Are Not Materially Misleading

Defendants argue that neither the pre-Incident statements nor the post-Incident statements Plaintiffs alleged are materially misleading as a matter of law.  The Court agrees.

"An alleged misrepresentation is material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock."  *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (internal references omitted).  From the point of view of a reasonable investor, the statement must "have significantly altered the total mix of information made available."  *Id.* (internal references omitted).  "The statement must also be misleading, evaluated not only by literal truth, but by context and manner of presentation." *Id.* (internal references omitted).  "The touchstone of whether a statement is misleading under federal securities laws is whether a *reasonable* investor would find it to be so."  *Born*, 521 F. Supp. 3d at 485.  "Similarly, for an alleged statement to be 'material' under Section 10(b), . . . it must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome."  *City of Hialeah Emps. Ret. Sys. v. Peloton Interactive, Inc.*, ___ F.4th ___, 2025 WL 2457758, at *3 (2d Cir. 2025) (internal references omitted).  Moreover, "'[e]xpressions of puffery and corporate optimism do not give rise to securities violations.'"  *Id.* (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).  "The test for whether a statement is materially misleading under Section 12(a)(2) is identical to that under Section 10(b): whether representations, viewed as a whole, would have misled a reasonable investor." *Rombach*, 355 F.3d at 178 n.11.

### A.  The Pre-Incident Statements Are Not Materially Misleading

Beginning with the pre-Incident statements, Defendants argue that (1) the statements were too generalized; (2) Block included cautionary language as part of its statements; (3) Block

was under no duty to characterize itself in a pejorative manner; and (4) Plaintiffs have not alleged that Block's internal controls were in fact deficient. Plaintiffs argue that those statements were misleading because, while they discussed the risks of a data breach, they omitted to disclose that Block had inadequate security measures in place at the time. The Court agrees that the statements were not materially misleading.

As an initial matter, none of the statements made to Block or Afterpay shareholders were materially misleading because Plaintiffs did not adequately allege that Block's internal security measures were in fact deficient. *See Rombach*, 355 F.3d at 174 (plaintiffs "must do more than say that" statements are misleading; "they must demonstrate with specificity why and how that is so"); *Emps. Ret. Sys. of City of Providence v. Embraer S.A.*, No. 16-cv-6277 (RMB), 2018 WL 1725574, at *9 (S.D.N.Y. Mar. 30, 2018) ("Where plaintiffs allege that internal controls are deficient, courts have consistently required plaintiffs to allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why." (internal references omitted)). Plaintiffs put forward several allegations and arguments in support of their contention that Block's internal controls were deficient. First, Plaintiffs argue that they alleged that a former employee—who previously had access to customer reports as part of their previous job responsibilities—downloaded reports containing customer information "without permission" (as per a public company statement), CAC ¶ 33, and that "[i]t is elementary that a reasonable company would revoke data access to all [former employees]." Dkt. No. 94 ("Pls.' Br.") at 9. But Plaintiffs never alleged that Block did not revoke access; they never alleged *how* the former employee gained access to the PII, only that he or she did so "without permission." But that is consistent with a number of scenarios, including a true hack (using knowledge of Block's systems gained during employment), exploitation of a "backdoor"

created during employment, use of another employee's stolen credentials, or any number of other options besides just the mistake of failing to revoke credentials at termination. Indeed, Plaintiffs themselves allege that "Block has not publicly disclosed the reasons that the [former employee] had access to sensitive information about its customers." CAC ¶ 35. They allege only that "[s]ome [unidentified] experts *believe* that the breach came from an orphaned account still active on a third-party software . . . or from a lack of proper communication protocols between Block's Human Resources and IT departments." *Id.* ¶ 35 (emphasis added). Hence, even if Plaintiffs are correct that "a reasonable company would revoke access to all [former employees]," Pls.' Br. at 9, nowhere do Plaintiffs allege that Block failed to do so, nor apparently can they so allege. *See In re Citigroup Sec. Litig.*, No. 20-cv-9132 (LAP), 2023 WL 2632258, at *16 (S.D.N.Y. Mar. 24, 2023) ("[S]etting aside the conclusions [in the complaint] and looking to the actual factual allegations," finding that plaintiffs never alleged that defendant did not invest in its risk management systems, as it said it was doing in various statements). Relatedly, to the extent Plaintiffs argue that the mere fact of the data breach itself demonstrates inadequate controls, Plaintiffs do not adequately explain why this is so, especially considering they do not know how the Incident occurred.

Second, Plaintiffs also point to the opinion of Myers, who they allege stated in "his 'professional opinion that Block, Inc. and its subsidiary Cash App Investing LLC [] did not have adequate information security protections in place at least around the date of the December 10, 2021 data security breach [] as it relates to former employees and system access controls.'" CAC ¶ 30. But without other factual allegations adequate to support Plaintiffs' contention, this expert opinion is insufficient. "Pursuant to Federal Rule of Evidence 702, an expert may testify in the form of an opinion, and it is well established that to survive a motion to dismiss, a

complaint must contain sufficient *factual* matter, accepted as true, to state a claim to relief that is plausible on its face." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022) (internal references omitted). And "[a]lthough it is permissible for a plaintiff to bolster a complaint by including a nonconclusory opinion to which an expert may potentially testify, 'opinions cannot substitute for facts under the PSLRA.'" *Id.* (internal citation omitted); *cf. Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 150 (2d Cir. 2021) (plaintiffs adequately alleged material misrepresentations and omissions regarding whether there was a concrete plan in 2015 to relist defendant company by—*in addition* to utilizing an expert opinion of the general timeline in reverse mergers between making a backdoor listing and reaching agreement—listing in the complaint the multiple steps required to perform such a listing and citing two 2015 news articles that had reported that a plan involving relisting the company was provided to the same buyer group that ultimately bought the company). Thus, Myers' conclusory opinion "cannot rescue [Plaintiffs'] claims, unless that opinion was based on particularized facts sufficient to state a claim for fraud." *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 354. Here, Myers' opinion is based on his "expertise and analysis of [unspecified] publicly available information." CAC ¶ 30. As explained, the allegations regarding the Incident being perpetrated by the former employee are insufficient to plausibly allege that Block lacked adequate data security measures, and without more, Myers' opinion cannot alter that conclusion. In sum, Plaintiffs did not adequately allege that Block's internal controls for data security were inadequate. Because that premise forms the basis for the allegations that Block's pre-Incident statements regarding data security were misleading, Plaintiffs have failed to allege that the pre-Incident statements were misleading.

*Even if* Plaintiffs had adequately alleged that Block lacked adequate internal controls, the pre-Incident statements alleged are still not materially misleading for the reasons that follow.

### 1. Alleged Pre-Incident Misstatements and Omissions to Block Shareholders (Section 10(b))

The statements Plaintiffs highlighted from Block's Form 10-Ks filed on February 26, 2020, and February 23, 2021, and Form 10-Qs filed on August 2, 2021, and November 4, 2021, discussed the risks of the potential inadequacy of Block's data security measures or a potential data breach, including risks to Block's business and reputation as well as potential liability. *See* CAC ¶¶ 25, 98, 100–03. But these statements are not materially false or misleading because Block made no comment or characterization whatsoever regarding "the quality of its cybersecurity, only that [Block] considered it important." *In re Marriott Int'l, Inc.*, 31 F.4th 898, 903 (4th Cir. 2022) (internal references omitted). Such general statements of potential risks— which said nothing about the adequacy of Block's controls—could not have misled reasonable investors about the quality of Block's controls and measures. *See id.*[9]

Moreover, Block included cautionary language about the risks of a data breach, which lends further support to the conclusion that the statements were not misleading within the meaning of the securities laws. Under the "bespeaks caution" doctrine, alleged

---

[9] The Complaint also references statements that Block made to its customers in, for example, its privacy notices. *See, e.g.,* CAC ¶ 17. First, it is not clear whether Plaintiffs are alleging that these statements are false or misleading, or merely that they provide useful context. Second, if Plaintiffs are seeking to rely on these statements, it is not clear that they could satisfy the requirement that such statements be in connection with the purchase or sale of a security. Third, as to the Block shareholders, the statement was made on January 1, 2020, before the alleged Class Period, *see* CAC ¶ 17 n.4, and Defendants can only be liable for statements made during the class period. *See In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998). Fourth, and perhaps most importantly, the identified statements are not misleading as a matter of law. Noting that "we do a lot to keep your data safe" and "we think we have strong defenses in place, [but] no one can ever guarantee that hackers won't be able to break into our sites or steal your data," *id.*, are exactly the sort of generalized and non-specific statements that courts have found are not actionable, particularly where the Plaintiffs provide no specific facts that could illuminate *why* the statements are false or misleading, beyond broad assertions that if they were true then the Incident could not have happened.

misrepresentations are "'immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.'"  *Rombach*, 355 F.3d at 173 (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)).  This inquiry is marked not by whether isolated statements are true, but whether "defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered."  *Id.* (internal references omitted).  While such cautionary language about future risks "cannot insulate from liability the failure to disclose that the risk has transpired," *id.*, here the risk had not yet transpired for the pre-Incident statements.  Under the circumstances of this case, no reasonable investor could have been materially misled, in light of the lack of express representations about the quality of Block's data security and the express warnings regarding potential data breaches.

### 2. Alleged Pre-Incident Misstatements and Omissions to Afterpay Shareholders (Section 12(a))

The Securities Act Plaintiffs also allege that the Scheme Booklet highlighted Block's published privacy policies and terms of service that stated that Block had implemented "technical and organizational measures designed to secure your personal information."  CAC ¶ 47.  Plaintiffs also argue in their brief that Block's public privacy notice stated that the company takes "reasonable measures, including administrative, technical, and physical safeguards, to protect your information from loss, theft, and misuse, and unauthorized access, disclosure, alteration, and destruction."[10]  *Id.* ¶ 17; Pls.' Br. at 7.

---

[10] Again, it is far from clear in the CAC that Plaintiffs alleged this statement was false and misleading.  This statement was contained under an introductory subheading separate from the subheading that appears nearly 10 pages later titled "Materially False or Misleading Statements Made to Afterpay Shareholders."  And despite Plaintiffs' grouping, in their Opposition brief, of this statement with another statement that was transmitted to (now-former) Afterpay shareholders in the Scheme Booklet,

But these statements constitute mere "puffery," which does not give rise to securities violations. *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *see also Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 250 (S.D.N.Y. 2019) ("Certain categories of statements are immaterial as a matter of law, such as 'puffery[.]'"). Statements that a company has implemented internal controls do not, on their own, "constitute assertions that the controls are adequate, nor does a subsequent circumvention of such controls support an inference that the descriptive statements about the implementation of such controls were false." *Barilli*, 389 F. Supp. 3d at 253.

With respect to the statement that Block implemented measures "*designed to* secure [customers'] personal information" (emphasis added), this statement is far too general to be actionable. *See Citigroup Sec. Litig.*, 2023 WL 2632258, at *14 (S.D.N.Y. Mar. 24, 2023) (statements that the company had systems "designed to protect [the company]," and "policies, procedures, and processes" to control risks were "nothing more than 'simple and generic assertions'"). Similarly, the statement that Block had taken "reasonable measures" to protect customer information is also general and inactionable puffery.

Plaintiffs argue that these statements are more akin to the kinds of particularized statements that courts have found to be actionable. *See* Pls.' Br. at 10. But where courts in this Circuit have "found that descriptions of compliance efforts amounted to actionable assurances of actual compliance, the descriptions of such efforts were far more detailed." *Singh*, 918 F.3d at 63. Plaintiffs principally rely on *City of Brockton Retirement System v. Avon Products, Inc.*, in which the defendant company made statements regarding its financial integrity in a public report

---

there is no clear indication that this statement was included in the Scheme Booklet to Afterpay shareholders. Even setting these issues aside, Plaintiffs' arguments fail for the reasons described.

that the court found went "beyond generalized expressions of commitment to high corporate standards, and address[ed] concrete steps that [the company took] to ensure the integrity of its financial reporting." No. 11-cv-4665 (PGG), 2014 WL 4832321, at *16 (S.D.N.Y. Sept. 29, 2014). Plaintiffs fixate on a sentence in that case in which the company represented that it had "a comprehensive and well-documented set of internal controls that provides *reasonable assurance* that its financial transactions are recorded accurately and completely," *see* Pls.' Br. at 10 (quoting *Avon*, 2014 WL 4832321, at *16), but the entire statement reviewed by the court was much more specific than this generalized statement. The defendant in that case specifically represented (i) that management conducted "quarterly and annual self-assessments and independent monitoring from internal audit"; (ii) that "every single financial reporting location participates" in the annual assessment and must make certifications regarding the design and operation of its control environment; and (iii) that to meet requirements in the Sarbanes-Oxley legislation, the company "created an internal team of global accounting and auditing professionals" to assist with "the identification, documentation, and review of over 12,000 internal controls across all markets and key functions." *Avon*, 2014 WL 4832321, at *16. The highly specific representations in *Avon* can be contrasted to the generic and aspirational assertions here about having implemented "technical and organizational measures designed to" secure personal information and having taken unspecified "reasonable measures" to safeguard customer information. *See Singh*, 918 F.3d at 64; *see also Citigroup Sec. Litig.*, 2023 WL 2632258, at *13 ("In reality, the CAC strings together what are mostly routine, generic, and vague statements regarding [the defendant's] . . . risk management policies and procedures . . . that Plaintiffs have plucked from various communications . . . and attempted to transform from general to specific by grouping them together."). No reasonable investor could understand these general statements—

which lack any meaningful detail about the quality of the measures or controls—as an assertion about the adequacy of Block's internal controls.

Plaintiffs appear to make much of the word "reasonable" in describing the measures taken by Block. *See* Pls.' Br. at 7, 10. But this vague, positive term is not sufficiently specific to amount to a guarantee of Block's controls and measures regarding data security and accordingly the statement is not actionable. Indeed, even in cases involving much stronger positive language than merely stating that measures taken were "reasonable," courts have found general statements to be inactionable. *See ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 205–06 (statements that defendant had "risk management processes that are highly disciplined and designed to preserve the integrity of the risk management process," and that defendant "set the standard for integrity," were "too general to cause a reasonable investor to rely upon them. . . . These statements did not, and could not, amount to a guarantee that its choices would prevent failures in its risk management practices." (internal references and alterations omitted)).

Plaintiffs further argue that Block disclosed to Afterpay shareholders in the Scheme Booklet that the information it acquires "is subject to laws and regulations in the United States, the European Union, and elsewhere," CAC ¶ 46, and that "[t]hese laws impose specific cybersecurity standards," *see* Pls.' Br. at 7. They argue that they alleged in the CAC that the Federal Trade Commission ("FTC") imposes various data security standards (which they generally alleged involve restricting access to sensitive data), and that a failure to maintain reasonable security practices violates the FTC Act. CAC ¶ 26; Pls.' Br. at 8. Plaintiffs conclude that because a former employee at Block accessed customer records "without permission," Block must have violated the FTC Act. These claims are also insufficient.

22

First, Plaintiffs did not adequately allege that Block violated the FTC Act. Plaintiffs did not adequately allege that Block failed to follow the FTC's standards. Plaintiffs failed to meaningfully specify which standards were violated, beyond the vague allegation that the FTC "suggests" that companies limit access to PII to employees with a legitimate business need and that the FTC has cautioned companies to restrict access to sensitive data. *See* CAC ¶ 26. And, as explained, although Plaintiffs allege that a former employee accessed data "without permission," they did not adequately allege that Block improperly failed to restrict access to customer PII.

Second, to the extent Plaintiffs argue that the FTC's standards should give meaning and context to Block's commitment to maintaining "reasonable measures," the statement that Block is subject to U.S. laws and regulations was included in the Scheme Booklet and directed to Afterpay shareholders, but there is no indication whatsoever in the CAC that the statement in which Block stated that it had taken "reasonable measures"—which was included in a privacy notice directed to Block's customers—was included in the Scheme Booklet. Plaintiffs fail to adequately explain why or how Afterpay shareholders could be misled by applying the FTC's standards[11] to the interpretation of a statement directed to *customers* that was apparently not contained within the Scheme Booklet.

Third, neither that statement nor any other statement alleged to be misleading relates in any way to applicable laws or regulations, or makes any specific representations about whether Block does or does not meet such laws and regulations. Thus, a failure to meet the FTC's standards (assuming such failure had been properly alleged) could not render the statements at issue materially misleading because those statements made no representations about meeting

---

[11] There is no specific mention of the FTC Act or the FTC standards—or what those standards entail—in the Scheme Booklet.

23

such standards.  *See, e.g.*, *Carpenter's Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (statement that defendant established minimum controls requirements for all key areas of identified risk were not rendered false because defendant had no specific controls for its LIBOR submissions process; defendant did not represent that it had established controls for LIBOR).

Fourth, to the extent Plaintiffs rely more generally on the statement in the Scheme Booklet that Block's data collection efforts are subject to the laws and regulations of the United States and the European Union, this type of neutral statement also makes no assurances as to whether Block is in compliance with those laws and regulations.  This statement can be contrasted to the statement at issue in the case cited by Plaintiffs, *In re Goldman Sachs Group, Inc. Securities Litigation*.  In that case, in contrast to "open-ended, indefinite, or subjective" statements in other cases, the representations that the company had controls in place to address conflicts of interest, including specifically in situations where the company's services to a client or its own proprietary investments conflict with the interests of other clients, were highly specific and, as the court found, were "directly at odds" with the company selling "financial products to clients despite clear and egregious conflicts of interest."  No. 10-cv-3461 (PAC), 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014).  In contrast, the statement here merely states that various laws and regulations are applicable to Block's data collection; it cannot be rendered misleading just because Plaintiffs now argue that Block has violated the FTC Act, nor would a reasonable investor rely on such a general statement as a guarantee of full compliance.  *See, e.g.*, *Avon*, 2014 WL 4832321, at *14–16 (statements regarding the applicability of various laws and regulations and regarding the company's commitment to compliance were too general to be actionable); *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 360 (S.D.N.Y. 2015)

24

(statement that the company's corporate governance framework was subject to laws and regulations was not false or misleading where the company did not claim to be in compliance with those rules and regulations); *see also In re Liberty Tax, Inc. Sec. Litig.*, 828 F. App'x 747, 750–51 (2d Cir. 2020) (statement that a company's compliance task force was successful in assessing the work of the compliance department and was taking action to ensure that those "who do not uphold [the company's] standards are exited from the . . . system" was "inactionable puffery on which no reasonable investor would rely"; the statement provided "no qualitative assurances and affirmative guarantees regarding the company's compliance with applicable laws and . . . specific steps it had taken to achieve particular results." (internal references omitted)).

Moreover, the purportedly misleading statements specifically disclosed the risk of a potential data breach. For instance, the privacy notice Plaintiffs point to, in which Block stated it had taken "reasonable measures," also explicitly disclosed that data could be stolen: "While we think we have strong defenses in place, no one can ever guarantee that hackers won't be able to break into our sites or steal your data while it is stored or flowing from you to us or vice versa." CAC ¶ 17. Additionally, the statement contained in the privacy policies and terms of service referred to in the Scheme Booklet cautioned, "[W]e cannot guarantee that unauthorized third parties will never be able to defeat those [technical and organizational] measures or use your personal information for improper purposes." *Id.* ¶ 47. Thus, while Block stated that it had data security measures in place, it explicitly warned of the risks of a potential data breach, not just in these two statements, but as explained above, in each of the relevant Form 10-Ks and Form 10-Qs Plaintiffs have pointed to. While cautionary words cannot insulate a company from liability when it fails to disclose that the risk has transpired, for the reasons explained above, Plaintiffs failed to allege that such a risk had transpired. Thus, "[i]n light of these disclosures, it

cannot be said that Plaintiffs plausibly identify a material misrepresentation with respect to [the Company's] statements concerning its data security protocols." *Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at *8; *see also Marriott Int'l, Inc.*, 31 F.4th at 903 (finding that a reasonable reader of the company's public statements could not "have understood the company to be overrepresenting the extent to which it was 'securing and protecting customer data,'" especially when considering that the same filing disclosed the very data security risks that plaintiffs alleged made the company vulnerable (internal reference omitted)).

Overall, Plaintiffs have failed to plead that Defendants made materially misleading statements to either of the proposed plaintiff groups prior to the Incident.

### B.  The Post-Incident Statements Are Not Materially Misleading

Defendants also argue that the post-Incident statements alleged are not materially misleading, and that Plaintiffs have failed to adequately allege that Defendants knew about the Incident when those statements were made.  The Court agrees.

#### 1.  Alleged Post-Incident Misstatements and Omissions to Block Shareholders (Section 10(b))

With respect to the Exchange Act Plaintiffs, Plaintiffs allege that four post-Incident statements were materially misleading, which the Court will sort into two categories:  First, Plaintiffs point to Block's January 31, 2022, press release describing the Afterpay merger, and Block's February 24, 2022, annual shareholder letter detailing the highlights from the final quarter of 2021.  Second, Plaintiffs point to Block's January 12, 2022, announcement that it received an ISO 27001 certification, which it said "validates the strength and effectiveness" of its information security management system, and to Block's Form 8-K filed on February 24, 2022, which emphasized the risks from a potential data breach but did not disclose the Incident.  For the reasons that follow, the Court finds that the statements in the first category were not

materially misleading, and that with respect to all of the statements, Plaintiffs failed to adequately allege that Defendants knew about the Incident when the statements were made.

"Pure omissions are not actionable under Rule 10b-5(b)." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 260 (2024). Because of this, "the Rule requires identifying affirmative assertions (*i.e.*, 'statements made') before determining if other facts are needed to make those statements 'not misleading.'" *Id.* at 264. Moreover, "[a]lthough companies have a duty to be complete and accurate when they make representations about particular topics, the duty extends only to representations that are germane to that particular topic." *In re Ferroglobe PLC Sec. Litig.*, Nos. 19-cv-629, 19-cv-2368 (RA), 2020 WL 6585715, at *7 (S.D.N.Y. Nov. 10, 2020) (internal references omitted)

Here, in the first category of post-Incident statements, Block said nothing at all—implicitly or explicitly—regarding data security or the potential for data breaches, so any omission of the Incident is a pure omission that is not actionable. In the words of the Supreme Court, Plaintiffs are unable to "identify[] affirmative assertions," which is the first step in determining whether an omission renders a statement misleading. *Macquarie*, 601 U.S. at 264. Plaintiffs attempt to cure this defect by arguing that Block engaged in half-truths, for instance by "focus[ing] on rosy details" in its February 24, 2022, shareholder letter and "trumpeting 'even better products and services'" in its January 31, 2022, press release, while ignoring the Incident. *See* Pls.' Br. at 15–16. But while Section 10(b) can cover half-truths and while Plaintiffs are correct that when Rule 10b-5 requires that if a company chooses to speak it must do so truthfully, *see, e.g.*, *Macquarie*, 601 U.S. at 264 (the rule "requires disclosure of information necessary to ensure that statements already made are clear and complete"), Plaintiffs appear to be operating under the misconception that the requirement that statements not be materially misleading is

triggered when a company speaks on *any* topic at all.  Rather, the duty to make accurate

representations extends to representations about the particular topic of the statement.  *See, e.g.*,

*Ferroglobe*, 2020 WL 6585715, at *7 ("Plaintiff's theory of falsity defines 'topic' at an untenable

level of abstraction[.]"); *see also In re ITT Educ. Servs. Inc. Sec. & S'holder Derivatives Litig.*,

859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) ("[T]he alleged omissions must be sufficiently

connected to Defendants' existing disclosures to make those public statements misleading."

(internal references omitted)).[12]  The statements here—which focus on the Afterpay merger and

the highlights from the final quarter of 2021, and which "focus[] on the rosy details" of Block's

business growth—are topics too far removed from the topic of the Incident or even of Block's

data security generally, and the omission of information regarding the Incident does not render

them misleading.[13]

Defendants also argue that the second category of post-Incident statements are not

actionable.  These statements would present a closer question if Plaintiffs had adequately alleged

---

[12] In the out-of-Circuit district court case Plaintiffs cited, *Salzman v. ImmunityBio, Inc.*, the court found that plaintiffs alleged that certain statements made by a pharmaceutical company misleadingly touting its manufacturing capacity created the impression that the manufacturing process for the company's lead product candidate was not experiencing difficulties, when it was in fact experiencing significant difficulties and its approval was accordingly at risk.  753 F. Supp. 3d 1050, 1060 (S.D. Cal. 2024).  The court noted that reasonable investors were likely to think the statements pertained to the company's lead product candidate, and the context of the statements also contributed to the court's decision; statements about the company's manufacturing capacity and compliance were preceded by discussions of the lead product candidate's clinical results and approval status.  *Id.* at 1061–62.  No similar context here makes the statements alleged misleading.  To the extent Plaintiffs argue that Block's prior acknowledgements that a data breach could pose a risk to its business and reputation with consumers mean that any statement about its business generally was necessarily also about its data security, that broad theory finds no support in the caselaw and the Court will not adopt it here.

[13] Plaintiffs raise in their brief (but not in the CAC) that an SEC rule authorized *after* the Incident required companies to file a Rule 8-K disclosure report within four business days after determining it has experienced a "'material cybersecurity incident.'"  *Id.* at 12–13 (quoting SEC Form 8-K Instruction B.1).  Although this rule did not apply to the Incident, Plaintiffs argue that the delay in filing a disclosure report even in the absence of a relevant rule is "strong evidence of false and misleading conduct."  *Id.* at 13.  But for the reasons explained below, *infra* Section III, Plaintiffs did not adequately plead when Block became aware of the Incident and its scope.

that Defendants were aware of the Incident when Block made the post-Incident statements. However, as discussed further below, Plaintiffs have not done so.  Defendants have no duty to disclose something that they were not aware of.  *See, e.g.*, *4FS Family, Inc. v. Lifchitz*, No. 21-903-cv, 2021 WL 5441264, at *2 (2d Cir. Nov. 22, 2021) (summary order).  In addition, as the Court finds below, Plaintiffs have not adequately alleged scienter and thus could not make out an Exchange Act claim on these statements in any event.

### 2.  Alleged Post-Incident Misstatements and Omissions to Afterpay Shareholders (Section 12(a))

Plaintiffs argue in their brief that the Scheme Booklet and the Deed created a duty for Block to update the Afterpay shareholders "until the date of the [Special] Meeting."  Pls.' Br. at 34.  Thus, per Plaintiffs, Block had a duty to update the Afterpay shareholders regarding the Incident at some point between December 10, 2021 (the date of the Incident) and December 14, 2021 (the date of the shareholder meeting).

Section 12(a) prohibits omissions of "material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77l(a)(2).  Omissions are actionable when a defendant has a duty to disclose, whether due to an "affirmative legal disclosure obligation" or when disclosure "is necessary to prevent existing disclosures from being misleading."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).  Although Section 12(a)(2) does not require pleading scienter, as discussed further below Plaintiffs have not alleged that Block was aware of the Incident by the date of the Special Meeting (just 4 days later).  Accordingly, even if the Deed or Scheme Booklet created an actionable duty to disclose new information, Block was under no duty to disclose something of which it was unaware.  *See 4FS Family, Inc.*, 2021 WL 5441264, at *2 (in

assessing Section 11 and 12(a)(2) claims, finding that the company is "under no duty to disclose litigation risk of which it is unaware.").[14]

## IV.    The Exchange Act Plaintiffs Did Not Adequately Allege Scienter

In addition to the numerous failings described above, dismissal of the Section 10(b) and Rule 10b-5 claim is also warranted because Plaintiffs failed to adequately plead scienter.  To state a claim under Section 10(b), Plaintiff must adequately allege that Defendants acted with scienter when making the allegedly false or misleading representations.  And "'while [courts] normally draw reasonable inferences in the non-movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter' because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 196 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)).  In order "to qualify as a 'strong inference,' the inference of scienter must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'"  *Id.* at 198 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).  "When the defendant is a corporate entity," like Block, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund*, 531 F.3d at 195.  "But it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Id.*

---

[14] Defendants further argue that Plaintiffs' Section 12(a)(2) claim is impermissibly extraterritorial and that the claim is not predicated on a prospectus or public offering.  Because the Section 12(a)(2) claim is dismissed for the reasons explained herein, the Court need not decide these issues to resolve the motion.

To plead scienter in a Section 10(b) and Rule 10b-5 claim, the requisite state of mind is either (1) an intent "to deceive, manipulate, or defraud," or (2) recklessness, defined as "at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 198 (internal references omitted). Scienter can be established by alleging facts showing either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* To plead motive and opportunity, a plaintiff must allege that the defendant "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 198 (internal references omitted). If a plaintiff is unable to make a "motive" showing, "the strength of the circumstantial allegations must be correspondingly greater." *Id.* at 199 (internal references omitted). "At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" *Id.* (quoting *Novak*, 216 F.3d at 311). Plaintiffs' allegations of scienter do not meet this standard. Plaintiffs make several allegations regarding Defendants' awareness of (1) Block's

31

allegedly inadequate security measures, and (2) the Incident, which the Court will analyze in turn.

First, regarding Defendants' awareness of Block's allegedly inadequate security measures or controls, Plaintiffs allege that ahead of the merger with Afterpay, "Cash App user accounts had been hacked on a number of occasions, resulting in fraudulent transfers of customer funds," and in 2020, "Cash App user reviews mentioning the words 'fraud' or 'scam' had increased by 335%." CAC ¶¶ 116–17. Plaintiffs also allege that "[f]rom February 2020 through March 2021, the Better Business Bureau ('BBB') received and reviewed 2,485 complaints concerning Cash App and 3,532 concerning Square," which was higher than the complaints received for competitors Venmo (928) and Zelle (83). *Id.* ¶ 117. Plaintiffs did not allege what the nature of the complaints were, or whether they relate in any way to data security issues as opposed to customer service or some other issue, although Plaintiffs insinuate that the complaints related to "fraud[s]" or "scam[s]" due to Cash App reviews containing those words. Plaintiffs further point to an August 2021 *Medium* article that "discussed the proliferation of hacking attacks on Cash App" and stated that the company was "'at fault for not having better blocks.'" *Id.* ¶ 118. Finally, Plaintiffs allege that Defendant Dorsey "was well aware of Block's deficient internal controls" because he was previously a "founder and the CEO of Twitter from May 2015 until November 29, 2021, and a director of Twitter until May 22, 2022"; they allege that in August 2022, a Twitter whistleblower complaint by Peiter Zatko (head of Twitter's cybersecurity) was leaked, and "Zatko claimed on July 6, 2022, that Twitter's data security controls suffered from 'egregious deficiencies, negligence and willful ignorance.'" *Id.* ¶ 119.

None of these allegations speak to motive, so the Court must assess whether Plaintiffs have raised "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA,*

*Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 198.  They have not.  Reports of the hacking of Cash App user accounts, including scams perpetrated by third parties on customer accounts, do not necessarily speak to awareness by Block's agents of the adequacy of Block's *internal* security controls, which are the subject of the alleged misstatements.  *See Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55, 59 (2d Cir. 2018) (summary order) (regulatory reports from Federal Reserve failed to raise an inference of scienter because they largely did not concern the company's anti-money laundering controls, which were the subject matter of the alleged misrepresentations).  Nor does an article merely speculating that Block needed "better blocks"—which in any event again appears to focus on scam artists targeting customers—adequately raise an inference of scienter.  Additionally, the allegation that Dorsey previously been an officer and director of Twitter—an unrelated company, which a whistleblower has alleged had inadequate data controls—has no bearing on Dorsey's scienter with respect to *Block's* internal controls.  And in any case, the whistleblower complaint far post-dates the challenged statements and even the Incident itself; there's no indication as to when Twitter's internal controls allegedly suffered from deficiencies, or when anyone at Twitter (including Dorsey) knew about it.

Second, with respect to knowledge of the Incident, Plaintiffs make various allegations as to why "Defendants are or should be presumed to have contemporaneous knowledge of" the Incident, some which also apply to knowledge of inadequate internal controls.  *See* CAC ¶ 120.  Beginning with allegations concerning motive and opportunity, Plaintiffs allege that "Defendants had strong motives or incentives to keep the December 10, 2021 [Incident] and their inadequate and defective security measures and controls" hidden because of the ongoing Block merger with Afterpay, and accordingly, "Defendants had both financial and reputational motives to conceal"

the Incident. *Id.* ¶¶ 125–27. Plaintiffs allege that the merger depended on the shareholder

approval vote at the Special Meeting on December 14, 2021, and the Australian court's approval

on December 17, 2021 (which elsewhere in the Complaint Plaintiffs described as the date on

which the merger was "legally effective," *id.* ¶ 66), and that the acquisition was completed on

January 31, 2022. *Id.* ¶ 126. But Plaintiffs do not sufficiently allege how any Block corporate

officer "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216

F.3d at 307–08. The Second Circuit has made clear that motives that are common to most

corporate officers do *not* constitute "motive" for the purposes of scienter; rather, the showing "is

generally met when corporate insiders allegedly make a misrepresentation in order to sell their

own shares at a profit." *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 198;

*see also Swanson v. Danimer Sci., Inc.*, No. 23-7674-cv, 2024 WL 4315109, at \*3 (2d Cir. Sept.

27, 2024) (summary order) (affirming dismissal where, though plaintiffs had alleged that the

company entered a merger agreement that would give it access to cash and the individual

defendants were under pressure because the company was "desperate for cash," plaintiff failed to

establish how these motives were "'personal' or qualitatively different from the 'generalized

financial motives' of corporate officers" (internal references omitted); *Solomon v. Sprint Corp.*,

No. 19-cv-5272 (MKV), 2022 WL 889897, at \*9 (S.D.N.Y. Mar. 25, 2022) (same). The Second

Circuit has acknowledged that "the artificial inflation of stock prices in order to acquire another

company may, 'in some circumstances,' be sufficient for scienter," but this is an "extremely

contextual" inquiry that requires inquiring whether the plaintiff alleged "a unique connection

between the fraud and the acquisition." *ECA, Local 134 IBEW Joint Pension Trust of Chicago*,

553 F.3d at 201 n.6 (quoting, in part, *Rothman v. Gregor*, 220 F.3d 81, 92–94 (2d Cir. 2000)); *see*

*also id.* at 200–01 ("generalized desires [to raise the stock price in advance of an acquisition] fail

to establish the requisite scienter because the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired" (internal references omitted)).

Here, the allegations that Block's corporate officers were motivated to hide the Incident and Block's inadequate security controls to facilitate the merger with Afterpay is precisely the type of generalized motive common to most corporate officers that is insufficient to establish scienter. Plaintiffs have failed to show any "unique" connection between the alleged misstatements and the merger, or any specific allegation as to how Block's corporate officers benefitted in some particular and concrete way.[15] Moreover, Plaintiffs' own expert opines no further than that Defendants likely learned about the Incident "within days or weeks of the breach, prior to Block's January 12, 2022 press release," but this was *after* the merger became "legally effective" on December 17, 2021, and thus does not support a motive to defraud. *See* CAC ¶ 66; *see also Rothman*, 220 F.3d at 93–94 (of a company's four acquisitions, three that occurred in 1996 could not support a motive to commit fraud—in the form of accounting for royalty advances as assets instead of expenses—because even under plaintiffs' theory, the company was not previously aware that the royalty advances should have been accounted as assets). And if the impending merger was the reason for failing to disclose the Incident, this does

---

[15] Plaintiffs' allegation that Defendant Ahuja had "realized millions of dollars in unjust enrichment" as a result of "stock awards, bonuses, salary, and other incentives tied to the merger," CAC ¶ 11, does not show a sufficiently "direct link between the compensation package and the fraudulent statements." *ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 201. These allegations are far too generalized, unlike, for instance, a situation in which a corporate officer made misrepresentations to artificially inflate prices in order to sell their own stock; the generalized motive alleged here is common to most corporate officers and is insufficient to show scienter. *Id.*; *Kalnit v. Eichler*, 264 F.3d 131, 139–41 (2d Cir. 2001) (a desire to maintain or increase executive compensation can be imputed to all corporate officers). Plaintiffs' allegations that other individual defendants were involved in the acquisition are similarly unavailing. *See* Pls.' Br. at 19.

not explain why Plaintiffs then waited until April 4, 2022, to do so, around four months after the

merger became legally effective (and two months after it was completed on January 31, 2022).[16]

These allegations are in stark contrast to the cases from this Circuit cited by Plaintiffs,

which made clear that whether an impending acquisition can establish scienter depends on the

particular circumstances of the case and which, in any case, all found that plaintiffs had

adequately pled *additional* motives or circumstantial evidence of conscious misbehavior and

recklessness sufficient to establish scienter. *See Rothman*, 220 F.3d at 94 (a company's

acquisition of another company for cash and shares of stock could support a motive to commit

fraud, "in combination" with other allegations that showed a strong inference of recklessness); *In*

*re Complete Mgmt, Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 328–29 (S.D.N.Y. 2001) (describing the

motive allegation concerning acquisitions as "an extremely contextual one"; additional

allegations regarding the volume and timing of insider sales also supported a strong inference of

scienter); *In re Initial Public Offering Sec. Litig.*, 358 F. Supp. 2d 189, 215 (S.D.N.Y. 2004)

(determining that an acquisition "by itself" was insufficient to establish motive for individual

defendants)[17]; *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Ind. Ltf.*, 432 F. Supp. 3d 131,

169–71 (D. Conn. 2019) (concluding that plaintiffs adequately pled that defendants engaged in a

price-hike strategy "implemented to increase revenue and inflate the price of their stocks to use

---

[16] Plaintiffs, in their opposition brief, note that the deal was dependent on approval by the Bank of Spain ("expected to be satisfied in mid-January 2022,"), which was based on an (unidentified) condition. Pls.' Br. at 20; CAC ¶ 58.  But nowhere in the Complaint do Plaintiffs allege that the Bank of Spain had discretion to deny approval based on a disclosure regarding the Incident, nor do Plaintiffs appear to argue this in their brief.

[17] Under the specific facts of that case, the court stated that "[w]hether the proposed stock-based acquisition of [a company] can establish motive on the part of [Defendant] is a question of fact that cannot be decided on a motion to dismiss," *Id.*  In other contexts, courts—including the Second Circuit—have conducted this particularized analysis and granted motions to dismiss on that basis. *See, e.g., ECA, Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 201.

as currency to acquire" another company).  Plaintiffs simply have not adequately alleged that Defendants had motive and opportunity to commit the alleged fraud.

Having failed to show motive, Plaintiffs must make an even stronger circumstantial showing of conscious misbehavior or recklessness to establish knowledge of the Incident prior to any of the post-Incident statements alleged to be misleading.  First, Plaintiffs allege that *if* Block had adequate systems in place, Defendants would "likely" have discovered the breach shortly thereafter; they relatedly note that the "ISO 27001 standard mandates prompt management reporting of security incidents and breaches."  CAC ¶ 121.  But Plaintiffs' premise here assumes that Defendants had adequate systems and controls in place, though Plaintiffs allege the opposite. Moreover, Plaintiffs' reasoning is faulty because they do not adequately explain *why* Defendants would have discovered the breach in short order if Block had adequate systems in place or even what data security systems (adequate or otherwise) Block had at the time of the Incident.  This failure of pleading only highlights the problem noted earlier, that Plaintiffs have made no specific allegations regarding how the Incident occurred and thus are unable to identify what systems or measures could have or should have detected it, and in what timeframe.  Finally, although Plaintiffs allege that the ISO 27001 standard mandates *reporting* of security breaches (upon detecting them), Plaintiffs have not sufficiently alleged that adequate security systems (whether under the ISO 27001 standard or otherwise) would have necessarily *detected* the kind of breach that characterized the Incident.  The mere fact of certification does not show when Block would have or should have discovered the Incident, or what specific information about it would be reported under the standard, and Plaintiffs have failed to fill these gaps.

Further, Plaintiffs allege that the "depth and particularity of Block's admissions in their April 4, 2022 Form 8-K filing" regarding the Incident supports "a strong inference that . . .

discovery was likely shortly after December 10, 2021" (Plaintiffs do not define "shortly after" or whether the undefined moment comes before the statements at issue were made). *Id.* ¶ 122. Specifically, Plaintiffs point to the fact that Block revealed (1) that it and its outside counsel had launched an investigation with the help of a leading forensics firm; (2) that Block was in the process of notifying around 8.2 million current and former customers, as well as regulatory authorities and law enforcement; (3) that Block had identified the perpetrator as a former employee who had regular access to the reports as part of their past job responsibilities, but had accessed the reports without permission after their employment ended; (4) that the former employee had taken information such as customers' full names and brokerage account numbers, and for some customers, brokerage portfolio values, brokerage portfolio holdings and stock trading activity for one trading day; (5) that certain categories of information were not taken; (6) that no customers outside the United States were impacted. *Id.* But Plaintiffs' theory is entirely speculative, and these speculative allegations do not give rise to a strong inference of knowledge soon after December 10, 2021, sufficient to support an allegation of scienter regarding the post-Incident statements. None of the identified information known to Block or actions taken by Block are sufficiently in depth and particularized to support a strong inference that Block must have known about the Incident by February 24, 2022, the date of the last post-incident "misstatement" that Plaintiffs highlight. Similarly, none of these allegations support a strong inference that Block must have known about the breach by December 17, 2021 (when the merger became legally effective), or January 31, 2022 (when the acquisition was completed). Indeed, it seems entirely plausible that a company with sophisticated counsel could accomplish these tasks within days or weeks of becoming aware of the breach. Even drawing all plausible inferences in favor of Plaintiffs, they have not adequately pled *why* it would take Block so much time to hire

outside counsel and begin the investigation, to identify the source of the Incident, to identify generally the types of categories of information stolen, and to begin notifying customers; or why it is reasonable or even plausible to conclude that these tasks necessarily mean that Block was aware of the Incident prior to the last of the statements alleged to be misleading, approximately six weeks prior in late February 2022.

Plaintiffs make various other arguments regarding scienter:  They allege Myers believes that "'more likely than not the [Incident] was detected by the established data protection protocols/mechanisms at Block/CashApp within days or weeks of the breach, prior to [January 12, 2022].'"  CAC ¶ 124.  This opinion is allegedly "based upon [Myers'] expertise and analysis of publicly available information," including regarding the ISO 27001 certification.  *Id.*  But this, too, fails to tip Plaintiffs' scienter allegations over the heightened pleading standard.  Not only does this conclusory opinion fail to allege that any particular individual Defendant or any agent of Block had specific knowledge, but "it is well established that an expert may not opine on the state of mind or knowledge of a party."  *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, No. 21-cv-8255 (JMF), 2024 WL 873436, at *6 (S.D.N.Y. Feb. 29, 2024).  Moreover, the allegation the Defendant generally "more likely than not" detected the Incident is insufficient under the heightened standard of the PSLRA.  *In re Henry Schein, Inc. Sec. Litig.*, No. 18-cv-1428 (MKB), 2019 WL 8638851, at *19 (E.D.N.Y. Sept. 27, 2019) (allegation that defendant was "'*likely* directly informed of'" the fraud was "insufficient to satisfy the heightened pleading standard").  Plaintiffs argue that Myers' opinion merely bolsters allegations that Defendants knew facts or had access to information from the ISO 27001 mandated management reports, *see* Pls.' Br. at 23 n.13, but Plaintiffs' arguments still fail to bridge the gaps in the scienter allegations regarding the ISO 27001 certification detailed above, and to adequately plead scienter about the Incident.

39

Plaintiffs further allege that Defendants' scienter can be "inferred" from Block's refusal to publish information about its own investigation and its alleged lack of cooperation with the Consumer Financial Protection Bureau in what appears to be an unrelated investigation regarding "Cash App's handling of customer complaints and disputes." CAC ¶¶ 128–132. But Plaintiffs do not adequately explain—and the Court does not see—how these allegations create an inference of scienter at the time the allegedly misleading statements were made. Plaintiffs also argue in their brief that given the importance of Block's cybersecurity measures to its business, it would be "absurd to find now that Block's management remained unaware of Block's cybersecurity failures," including because senior management was also signing SEC filings and involved in the Afterpay acquisition. Pls.' Br. at 24. The "core operations doctrine permits an inference that a company and its senior executives have knowledge of information concerning the core operations of a business, which include matters critical to the long term viability of the company and events affecting a significant source of income." *In re CarLotz, Inc. Sec. Litig.*, No. 21-cv-5906 (AS), 2024 WL 1348749, at *16 (S.D.N.Y. Mar. 29, 2024) (internal references omitted). The Second Circuit has "not expressly determined if this inference is adequate on its own to allege scienter in the wake of the passage of the PSLRA," *Swanson*, 2024 WL 4315109, at *2, and in any case, it does not adequately show here that Defendants had knowledge of the Incident at the relevant times. These circumstances are far afield from that of the Ninth Circuit case cited by Plaintiffs, in which the court found that plaintiffs had alleged that a senior executive of a holding company for Google (and who made critical operating decisions for Google) was aware of a critical software glitch in certain of Google's privacy settings. Pls.' Br. at 24 (citing *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021)). In that case, plaintiffs alleged with particularity that Google staff had prepared a memo regarding the glitch

40

that informed senior leadership at Google of the issue, and the court—considering the role of the holding company's senior executive in Google's operations—found a strong inference that the executive was also informed of the issue. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th at 706. In contrast, Plaintiffs have not adequately pled with particularity that *anyone* at Block became aware of the Incident prior to some time shortly before April 4, 2022. Vague references to the core operations doctrine cannot do all the legwork in establishing scienter here, where adequate facts showing scienter have not been alleged. Finally, Plaintiffs argue that Defendants had a duty to monitor information and to update the Scheme Booklet when they learned of the Incident, but, again, this assertion accomplishes nothing when no facts establish, or even sufficiently allege, when Defendants learned about the Incident.

Overall, contrary to Plaintiffs' assertion that Defendants should be presumed to have knowledge of the Incident and the inadequate internal controls, Plaintiffs have not adequately alleged any motives or circumstantial facts establishing scienter, whether from knowledge of the Incident or for any other reason.

### V.    Control Person Claims

Section 15 of the Securities Act and Section 20(a) of the Exchange Act provide for what is known as "control person" liability; both require a primary violation of the securities laws. *See In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *23 (dismissing Section 20(a) claim where plaintiffs failed to adequately allege Section 10(b) and Rule 10b-5 claims); *In re Morgan Stanley Tech. Fund. Sec. Litig.*, 643 F. Supp. 2d 366, 382 (S.D.N.Y. 2009) ("Because [p]laintiffs' Section 11 and 12 claims against [d]efendants are without merit, their claim for control person liability [under Section 15] is also dismissed."). Because the Court found that Plaintiffs did not establish primary violations of the securities laws under either Section 10(b) and Rule 10b-5 of the

Exchange Act or under Section 12(a) of the Securities Act, Plaintiffs' control person liability claims also fail and are dismissed.

## CONCLUSION

For all the reasons set forth above, the alleged statements in the Complaint were not materially misleading as a matter of law and Plaintiffs failed to adequately allege scienter with respect to their fraud claim.  As such, Defendants' motion to dismiss is **GRANTED**, and the case is **DISMISSED.**  The Clerk of Court is directed to terminate Dkt. No. 90, and to **CLOSE** the case.

Dated: September 9, 2025
      New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge